UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

DENNIS JOHN HAHN,

               Petitioner,              Case No. 2:16-cv-164

v.

                                       Honorable Paul L. Maloney

JEFFREY WOODS,

               Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Dennis John Hahn is incarcerated with the Michigan Department of Corrections at the Muskegon Correctional Facility (MCF) in Muskegon, Michigan.  Following a six-day jury trial in the Gogebic County Circuit Court, Petitioner was convicted of first-degree felony murder, Mich. Comp. Laws § 750.316(a)(b), first-degree home invasion, Mich. Comp. Laws § 750.110a(2), and arson of a dwelling, Mich. Comp. Laws § 750.72.  On July 29, 2011, the court sentenced Petitioner as a habitual offender-second offense, Mich. Comp. Laws § 769.10, to respective prison terms of life without parole for murder, and 20 to 30 years for home invasion and arson.

On July 11, 2016, Petitioner timely filed his habeas corpus petition which raises four grounds for relief, as follows:

    I.      Petitioner was placed in visible shackles during trial without justification, in violation of the due process clause of the Fourteenth Amendment.

    II.     The admission of a lab report made by a non-testifying witness violated the Confrontation Clause.

    III.    Trial Counsel was constitutionally ineffective for failing to object to the admission of the Confrontation Clause violation.

IV.    Appellate counsel was constitutionally ineffective for failing to raise
Issues I and II on direct appeal.

(Pet'r's, ECF No. 2, PageID.16.)  Respondent has filed an answer to the petition (ECF No. 7)

stating that the grounds should be denied because they lack merit.  Upon review and applying the

standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat.

1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition

be denied.

On September 12, 2009, firefighters responded to a report of a burning mobile home

on Vanderhagen Street in Gogebic County, Michigan.  Inside the home they discovered the prone

body of Joel McFarlane and a shotgun.  A shotgun blast had carved a furrow up his chest, the

pellets entered his neck.  He was dead when the firefighters arrived.

The medical examiner/investigator discovered that Mr. McFarlane was dealing

with difficult circumstances.  The death was reported as a suicide.

Months later, in connection with the investigation of a different crime, law

enforcement officers discovered evidence that suggested the death might have been the result of

foul play.  The ensuing investigation culminated in Petitioner's trial.

Petitioner's focused habeas grounds do not require an in-depth recounting of the

testimony elicited from the dozens of prosecution witnesses.  As Petitioner does not contest the

summary of facts offered by the Michigan Court of Appeals, the Court will rely on that summary:

> According to the testimony presented at trial, the victim sideswiped defendant's car
> on September 11, 2009.  Defendant chased him until the victim crashed into a ditch.
> According to defendant, the victim appeared drunk, and offered to pay him $200 if
> he would not call the police.  Defendant eventually dropped the victim off after
> receiving some money from him.  A friend of defendant testified that defendant
> told him he went to the victim's home the next day for the rest of the money, but
> the victim "gave him the runaround" and told him to come back later.  Defendant
> then told his friend that he "beat the guy's ass."  He also told his friend that he
> found lighter fluid, sprayed it around, set the place on fire, and watched it burn from
> the woods. Defendant told police, to the contrary, that when he went to the victim's

home, he entered through an unlocked door, found a wallet with $60 in it, took the money, and then left.  He told the police that he did not remember if the victim was there.

Volunteer firefighters responded to the scene and discovered the victim's body in the hallway.  A shotgun lay next to the victim on his right side, with the barrel pointing toward the victim's feet.  The victim had sustained a gunshot wound on his chest and neck.  After a brief initial investigation, the lead officer and the medical examiner determined that the death had resulted from a suicide.  They did not process the trailer as a crime scene.  No x-rays or measurements of the victim's wounds were taken.  There was no autopsy.  However, several months later, while investigating another theft and arson, new evidence came to light regarding defendant's involvement with the victim, so the investigation was reopened.

(Mich. Ct. App. Op., ECF No. 8-21, PageID.1612-1613.)

The jurors heard the testimony of 56 witnesses: some knew the victim and his patterns of behavior, others saw him the day before he was found dead, a few witnessed the chase, or saw the crash after the fact.  Other witnesses knew Petitioner, saw him or communicated with him on September 11 or thereafter, or went with Petitioner as he looted the mobile home in the days and weeks following the fire.  Finally, many of the witnesses witnessed the fire or participated in extinguishing it, investigated the crime, examined the victim's body, or tested the evidence.  None of the witnesses saw Petitioner commit the crimes.  The evidence against Petitioner was entirely circumstantial, based on the events leading up to fire and Petitioner's incriminating statements to others after the fire.

After five days of evidence, argument, and instructions, the jury took about two hours to reach its verdict.  Petitioner, with the assistance of counsel, directly appealed his convictions and sentences.  Petitioner raised four issues: a challenge to the trial court's admission of Rule 404(b) evidence; a claim that the verdict was against the great weight of the evidence; the shackling claim (Habeas Issue I) together with a claim that trial counsel was ineffective for objecting to Petitioner's shackling; and a claim that Petitioner's sentence was improper.  (Pet'r's Appeal Br., ECF No. 8-21, PageID.1723.)  The Michigan Court of Appeals remanded the case for

development of the record on the shackling issue.  (Mich. Ct. App. Order, ECF No. 8-21, PageID.1654.)

Petitioner was not shackled in the traditional sense.  Petitioner asserts that, on the first day of trial, while jurors were standing in the courtroom waiting for the judge to enter, he was brought into the courtroom unrestrained.  (Aff.of Petitioner, ECF No. 8-21, PageID.1653.)  The Michigan Department of Corrections (MDOC) officer who escorted him into the courtroom ordered Petitioner to sit.  (*Id.*)  Once Petitioner was seated, the officer directed Petitioner to move his chair away from the counsel table and had Petitioner raise his legs, one leg at a time.  (*Id.*)  The officer then placed nylon "Tuff-Ties" on each of Petitioner's ankles.  (*Id.*)  Petitioner claims the jurors saw this procedure.

The trial court conducted an evidentiary hearing regarding Petitioner's claim on June 12, 2012.  The judge heard testimony from Petitioner's trial counsel, the county clerk, the bailiff, the court reporter, the MDOC officers, and Petitioner.  Only Petitioner testified that the Tuff-Ties were put in place in front of the jury.  (Hr'g Tr., ECF No. 8-15, PageID.1495-1497.)  The MDOC officer testified that it occurred at the first break when the jurors were out of the courtroom.  (*Id.*, PageID.1476-1479.)

After hearing all of the testimony, the trial judge determined Petitioner's account was unreliable.  He made a factual finding that there was "virtually no possibility that . . . any of the jurors would have observed [Petitioner] shackled on the first day of trial."  (*Id.*, PageID.1506.)

On June 13, 2013, the Michigan Court of Appeals issued an unpublished opinion affirming Petitioner's convictions, but reversing Petitioner's sentences on the predicate felonies of first-degree home invasion and arson and remanding to the trial court for resentencing on those convictions. (Mich. Ct. App. Op., ECF No. 8-21, PageID.1612-1624.)  The trial court resentenced

Petitioner on August 6, 2013.  Petitioner's sentences for first-degree home invasion and arson were

reduced from 20 to 30 years to 16 years, 8 months to 30 years.  (Resentencing Tr., ECF No. 8-16.)

At the same time Petitioner was pursuing resentencing on remand, he was, with the

assistance of counsel, pursuing an application for leave to appeal the court of appeals' decision in

the Michigan Supreme Court.  In that court, Petitioner presented only his first three appellate

issues.  (Appl. for Leave to Appeal, ECF No. 8-22, PageID.1818.)  The supreme court denied leave

by order entered November 25, 2013.  (Mich. Order, ECF No. 8-22, PageID.1816.)

Petitioner returned to the trial court.  On October 14, 2014, he filed a motion for

relief from judgment raising five issues including: (1) violation of the 180-day rule under Mich.

Comp. Laws § 780.131 et seq.; (2) denial of the right to jury trial and due process because of

inadequate voir dire: (3) violation of the right to confrontation where two experts relied on

testimonial hearsay (Habeas Issue II); (4) denial of the right to jury trial and due process because

of improper instructions and verdict form; and (5) ineffective assistance of trial and appellate

counsel for failing to raise issues I-IV (Habeas Issues III and IV).  (Mot. for Relief from J., ECF

No. 8-17, PageID.1521.)  By order entered October 29, 2014, the trial court denied the motion on

the merits.  (Gogebic Cty. Cir. Ct. Order, ECF No. 8-18.)  Petitioner sought leave to appeal the

trial court's decision in the Michigan Court of Appeals and the Michigan Supreme Courts.  Those

courts denied leave by pro forma orders entered May 4, 2015, and March 29, 2016, respectively.

(Mich. Ct. App. Order, ECF No. 8-25, PageID.1952; Mich. Order, ECF No. 8-26, PageID.1980.)

Petitioner then filed this petition.

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Petitioner complains first that his trial was rendered unfair and the presumption of innocence overcome by his appearance before the jury in shackles. The visible use of physical restraints on a criminal defendant might violate three fundamental legal principles: (1) the presumption of innocence; (2) an accused's ability to secure a meaningful defense by assisting counsel; and (3) the maintenance of a dignified and decorous judicial process. *Deck v. Missouri*,

544 U.S. 622, 630-32 (2005).  The Supreme Court concluded that the risk to those rights required courts to evaluate the circumstances of the particular case before permitting the use of visible restraints.  *Id*. at 632.

The trial court concluded that it had properly evaluated the circumstances when it ordered restraints in Petitioner's case.  Moreover, the trial rejected Petitioner's claim that the jury had seen Petitioner's restraints as factually unsupported:

> This hearing, ah, was conducted ah, at the, ah, upon remand, at a Court of Appeals, and they asked the Court to establish a record with regard to the in-chambers determination to shackle Mr. Hahn and the reasons why the trial Judge ordered him shackled.
>
> *        *        *
>
> [W]hat I recall, ah, of the discussion in chambers is we have an individual who is a – incarcerated in the State penitentiary, ah, for a serious crime; under the direction of the Department of Corrections being tried for murder, in the Gogebic County Circuit Court, ah, and I discussed in chambers, ah, with counsel present; I believe all counsel was present; I don't think I had a conversation with just Mr. McKenzie there, I ah, and I made a determination that there was virtually no chance that Mr. Hahn's would be observed – that the tuff ties would be observed by any juror; and that is the reason that I decided that he would be tuff tied.
>
> However, I find the testimony of Mr. Hahn is not reliable, although his affidavit indicates he was shackled or tuff tied in front of the jurors, ah, I have listened to the bailiff and the Clerk and court reporter and the Corrections officers and I just don't believe that it ever happened.
>
> I therefore make a finding that there is virtually no possibility that, ah, any of the jurors would have observed Mr. Hahn shackled on the first day of trial.

(New Trial Hr'g Tr., ECF No. 8-15, PageID.1506-1507.)

The court of appeals concluded that the trial court had erred when it ordered Petitioner shackled.  The factors upon which the trial court relied, the court of appeals concluded, were insufficient to support that decision.  Nonetheless, on the strength of the trial court's finding that the jury could not see the shackles on Petitioner, the Michigan Court of Appeals determined

the shackling presented no prejudice and, thus, did not require reversal of Petitioner's convictions. (Mich. Ct. App. Op., ECF No. 8-21, PageID.1618.)

Petitioner contends that the state court's determination, by demanding that Petitioner show prejudice, is contrary to or an unreasonable application of *Deck*. Petitioner bases that contention on the Supreme Court's holding in *Deck* that "'the defendant need not demonstrate actual prejudice to make out a [shackling] due process violation.'" (Pet'r's Br., ECF No. 2, PageID.36) (quoting *Deck*, 544 U.S. at 635). Petitioner's quotation from *Deck* is accurate—but significantly incomplete. The *Deck* court held:

> [W]here a court, without adequate justification, order the defendant to wear *shackles that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a [shackling] due process violation.

*Deck*, 544 U.S. at 635 (emphasis added.) The Sixth Circuit has routinely concluded that, under *Deck*, the shackles must be visible to the jury before they can be considered a due process violation. *See, e.g., Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017) ("'[V]isible' marks the key inquiry for us because a claim based on *Deck* 'rises or falls on the question of whether the [restraint] was visible to the jury.'"); *Adams v. Bradshaw*, 826 F.3d 306, 317 (6th Cir. 2016) ("[T]he visibility of a physical restraint upon a defendant to a jury [is] a critical factor to obtaining relief in such circumstances."); *Earhart v. Konteh*, 589 F.3d 337, 348 (6th Cir. 2009) ("Because the Supreme court had stressed 'at least six times' the limitation of its holding to visible restraints, we held that *Deck* 'concerned only *visible* restraints at trial.'") (citation omitted, emphasis in original); *Mendoza v. Berghuis*, 544 F.3d 650, 655 (6th Cir. 2008) ("Mendoza's restraints were not visible to the jury during trial. And the clearly established precedent upon which he relies—namely *Deck*—is expressly limited to cases where the defendant's shackles are 'visible to the jury' during trial.") (citation omitted, emphasis in original). Thus, the court of appeals' reliance on the fact that the jury did not see the restraints as a basis for rejecting

9

Petititioner's claim is entirely consistent with *Deck*.  Petitioner has failed to present any evidence, much less clear and convincing evidence, to rebut the state courts' presumptively correct determinations that the restraints were not visible to the jury.  Thus, the court of appeals' decision is entirely consistent with *Deck* and Petitioner is not entitled to habeas relief on his shackling claim.

Tests performed on the victim's blood revealed that the victim had breathed in little or no carbon monoxide before he died.  The analyst who performed the blood test did not testify at trial.  Nonetheless, the jury was exposed to those test results in several ways: (1) Dr. Iknayen referenced the results in a written report; (2) Dr. Iknayen testified regarding the result; (3) Dr. Smith referenced the results in a written report; (4) Dr. Smith testified regarding the result; and (5) the written blood test report was admitted into evidence.

Dr. Iknayen served as the medical examiner for Gogebic County.  (Trial Tr. III, ECF No. 8-10, PageID.720.)  He examined the victim's body.  (*Id*., PageID.722-723.)  Dr. Iknayen sent a sample of the victim's blood to the lab for testing.  (*Id*., PageID.731.)  It was tested first for the presence of alcohol and, eventually, for carbon monoxide.  (*Id*., PageID.731-733.)  The results indicated no detectable alcohol or carbon monoxide.  (*Id*.)  The test results were admitted into evidence during Dr. Iknayen's testimony.  (*Id*., PageID.735.)  Dr. Iknayen testified that meant the victim "was not intoxicated at the time of his death; and the carbon monoxide level, if he was alive at the time the fire was started, he wasn't alive for very long because he did not breathe in any smoke basically."  (*Id*., PageID.734.)

After consultation with his investigator, Dr. Iknayen prepared the death certificate indicating that the death was caused by a self-inflicted wound.  (*Id*., PageID.736.)  Dr. Iknayen changed his mind; an amended death certificate was prepared indicating that the death was a homicide.  (*Id*., PageID.737.)  The change was prompted, at least in part, by "reenactments"

attempted by the investigator that demonstrated it would have been virtually impossible for the victim to have pulled the trigger without the assistance of some sort of implement—his arms were not long enough—and no such implement was reported near the body.

Dr. Iknayen prepared a report regarding the examination during April of 2010. (Report, ECF No. 8-17, PageID.1564-1565.)  He amended that report when new information came in prompting a reevaluation of the evidence.  The amending addendum states: "A carbon monoxide level has been performed on the postmortem blood with results of <5% hemoglobin saturation. This result is consistent with a non-smoker without other significant exposure to carbon monoxide."  (Report Addendum, ECF No. 8-17, PageID.1566.)

Upon the reopening of the investigation, Gogebic County officials consulted with forensic pathologist Dr. Randolph Smith.  Dr. Smith referenced the blood test results in his testimony.  (Trial Tr. V, ECF No. 8-12, PageID.1208.)  Dr. Smith explained that any time a body is found near a fire, one thing that must be considered is whether the death was caused by the fire. (*Id*.)  The carbon monoxide blood test assists in that determination.  Here, Dr. Smith reported, the blood test results indicate that carbon monoxide from the fire did not cause the victim's death— the gunshot wound did.  (*Id*.)

Dr. Smith prepared a report as well.  (*Id*., PageID.1214-1216.)  The written report was much more pointed with respect to the blood test results: "Mr. McFarlane was dead at the time the fire started, based on blood 'carbon monoxide' test results evaluated in the context of this incident."  (Report, ECF No. 8-17, PageID.1583.)

Petitioner contends the introduction into evidence of the blood test results violated his Confrontation Clause rights.  Petitioner raised the issue for the first time in his motion for relief from judgment.  (Mot. ECF No. 8-17.)  The trial court rejected the claim stating: "This argument

11

lacks merit as most experts testify using information that is from other sources." (Gogebic Cty.

Cir. Ct. Order, ECF No. 8-18, PageID.1599.)[1]  To prevail, Petitioner must show that the trial

court's decision is contrary to, or an unreasonable application of, clearly established federal law.

   The Confrontation Clause of the Sixth Amendment gives the accused the right "to

be confronted with the witnesses against him." U.S. Const., Am. VI; *Pointer v. Texas*, 380 U.S.

400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment).

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against

a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding

before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  The Confrontation Clause

therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless

the witness is unavailable to testify and the defendant had a prior opportunity for cross

examination.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

   In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009), the Supreme

Court held for the first time that the affidavits of forensic analysts are testimonial statements that

are covered by the Confrontation Clause and subject to analysis under *Crawford*. *Id.*; *see also*

*Bullcoming v. New Mexico*, 564 U.S. 637, 658-59 (2011).  *Melendez-Diaz* involved lab reports

regarding analysis of suspected cocaine.  The Court characterized the lab reports—denominated

as certificates—to be the equivalent of affidavits.  Indeed, under Massachusetts law, the very

purpose of the certificates was "to provide 'prima facie evidence of the composition, quality, and

the net weight' of the analyzed substance . . . ." *Melendez-Diaz*, 557 U.S. at 311.  In a criminal

---

[1] The Michigan Court of Appeals then denied leave to appeal because Petitioner failed "to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (Mich. Ct. App. Order, ECF No. 8-25, PageID.1952.)  The Michigan Supreme Court denied leave for the same reason. (Mich. Order, ECF No. 8-26, PageID.1980.)  Thus, the trial court's decision is the "last reasoned opinion" and the decision that is properly evaluated on habeas review. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

trial where the composition, quality, and net weight of the substance were key elements, the Court concluded that the certificates were "functionally identical to live, in-court testimony . . . ." *Id.* at 310-11.

In *Bullcoming*, the Court considered the Confrontation Clause implications of admitting blood test results in a "driving while intoxicated" prosecution though the testimony of a person who worked at the lab and who was familiar with the lab's testing procedures, but had not conducted this specific blood test or signed the report. *Bullcoming*, 564 U.S. at 651. Even though the blood test results were not a sworn certification, the Court determined the results were testimonial and that Bullcoming's confrontation rights were violated. It is notable, however, that as in *Melendez-Diaz*, the reports at issue in *Bullcoming* bore directly on a matter at issue in the criminal trial: was the defendant under the influence of alcohol.

Then, in *Williams v. Illinois*, 567 U.S. 50 (2012), the Supreme Court considered whether an expert's testimony relying on a lab report regarding DNA test results violated the Defendant's confrontation rights. Five justices concluded that it did not. Four justices—Justices Alito, Kennedy, and Breyer, and Chief Justice Roberts—concluded that when an expert recounted the results of the test, the expert was not presenting the results for the truth of the matter asserted, but only as support for the expert's opinion. That conclusion, however, was premised on the fact that the report itself had not been introduced into evidence. That is not the case here.

Those same four justices offered an alternative reason for rejecting the Confrontation Clause challenge: the report was "plainly . . . not prepared for the primary purpose of accusing a targeted individual" and, therefore, was not testimonial. *Id.* at 84. Justice Thomas disagreed with the plurality opinion with respect to the "truth of the matter asserted" reasoning. Nonetheless, he concurred in the judgment because he agreed with the plurality that the report was

not testimonial.  He wrote separately because his reasoning differed from that of the plurality.

Justice Thomas explained that the report was not testimonial because it did not bear the indicia of

formalized testimonial materials:

> The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact.  Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained.  *See* Report of Laboratory Examination, Lodging of Petitioner.  The report is signed by two "reviewers," but they neither purport to have performed the DNA testing nor certify the accuracy of those who did.  *See ibid*.  And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation.

*Id*. at 111.

The four dissenting justices—Justices Kagan, Scalia, Ginsburg, and Sotomayor--

concluded that a straightforward reading of the opinions in *Crawford*, *Melendez-Diaz*, and

*Bullcoming* compelled the conclusion that the report here was offered for the truth of the matter

asserted and was testimonial; therefore, Williams' confrontation rights were violated.

Based on *Williams*, it simply cannot be said that any of the five ways the jury

learned about the blood test results violated Petitioner's Confrontation Clause rights.  The trial

court, in significantly truncated fashion, echoed the plurality's conclusion that expert reliance on

an outside report does not mean that the report or its contents are offered for the truth of the matter

asserted.  Moreover, whether evaluated under the "testimonial/non-testimonial" standard offered

by the plurality or the standard suggested by Justice Thomas, the report here, (ECF No. 8-17,

PageID.1567), is non-testimonial.  The state of the federal law on these issues is far from clearly

established; therefore, Petitioner cannot meet his burden under 2254(d).  Further, to the extent

*Williams* clearly establishes any federal law with regard to an expert's use of an outside report, the

trial court's rejection of Petitioner's Confrontation Clause claim was consistent with that clearly

established law.

Even if out-of-court testimonial statements were admitted in violation of the Confrontation Clause, Petitioner would not be entitled to habeas relief.  The Sixth Circuit has held that admission of evidence in violation of the Confrontation Clause is not a structural error.  *United States v. Graham*, 278 F. App'x 538, 545 n.2 (6th Cir. 2008).  Harmless error review would apply. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  Under the prevailing harmless error standard, the court must determine whether the Confrontation Clause violations had a "substantial and injurious effect or influence" in determining the jury's verdict.  *See Brecht v. Abrahamson,* 507 U.S. 619, 637-38 (1993).   That determination "depends on numerous factors, including 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015) (quoting *Van Arsdall*, 475 U.S. at 684).  Where the prosecution's case is strong and the violative evidence plays a relatively small role in the conviction, the error is harmless.  *Holland*, 800 F.3d at 243.

The blood test results here do not carry the significance that the blood test results carried in *Bullcoming*.  Petitioner contends that it was the carbon monoxide blood test results that prompted the reopening of the investigation.  There is no record support for that contention.  There is support for the proposition that the investigation was reopened based on the investigator's "reenactment" that suggested McFarlane may not have been able to pull the trigger.

Indeed, Dr. Iknayen interpreted the blood test results to mean that McFarlane died without inhaling much smoke, which could mean he died before the fire was set, or shortly thereafter.  That was entirely consistent with the defense theory that McFarlane started the fire and

15

then killed himself.   Petitioner acknowledges that fact in his brief.  (Pet'r's Br., ECF No. 2, PageID.47) ("[I]t certainly did not preclude suicide, as the victim could have shot himself immediately after starting the fire, thus explaining the low blood carbon monoxide level.").  That is what Petitioner's counsel argued.  (Trial Tr. VI, ECF No. 8-13, PageID.1382-1383.)

The report was also consistent with the prosecution theory that Petitioner killed McFarlane and then started the fire.  That is what the prosecutor argued.  (*Id.*, PageID.1339.)

Consider the significance, then, if the blood test had shown that McFarlane had inhaled carbon monoxide.   That would be entirely consistent with the defense theory that McFarlane started the fire and then killed himself.  It could also be consistent with the prosecution theory that Petitioner shot McFarlane and then started the fire.[2]  The test results themselves are just not critical to either side's theory.  Either side could use them whether the results showed the presence of carbon monoxide or the absence of it.

The only incriminating evidence related to the results came from Dr. Smith's written report which claimed the absence of carbon monoxide meant that McFarlane was dead before the fire was started.  That conclusion, however, was Dr. Smith's; it was not the conclusion of the blood test report's author.  Petitioner had every opportunity to cross-examine Dr. Smith regarding that conclusion which, based on Dr. Iknayen's testimony, was flawed.  Dr. Smith did not offer that opinion during his testimony.  His only testimony regarding the blood test results related to their purpose—to determine whether McFarlane had died as a result of smoke inhalation—and the conclusion that he had not.  Petitioner's suggestion that the blood test results played an influential role in his conviction is not supported in the record.

---

[2] Petitioner could have started the fire and then shot McFarlane or shot McFarlane and then started the fire yet McFarlane lived long enough to breathe the smoke.

16

For the foregoing reasons, even if *Williams* could be interpreted to clearly establish that the use of the blood test results here violated Petitioner's Confrontation Clause rights, the error was harmless. The blood test result was not important to the prosecution's case—it warranted only a brief sentence in the prosecutor's closing argument. (Trial Tr. VI, ECF No. 8-13, PageID.1339.) Neither expert relied on the report during his testimony to opine that McFarlane died before the fire started. Indeed, Dr. Iknayen testified, on direct examination, that the test report supported the hypothesis that McFarlane died before *or shortly after* the fire was started. (Trial Tr. III, ECF No. 8-10, PageID.734.) The only use of the report that could possibly have materially influenced the verdict was Dr. Smith's written report that flat-out stated the victim died before the fire was started. Petitioner's counsel had every opportunity to cross-examine Dr. Smith on that point; but he did not. The likely reason for counsel's decision to *not* pursue the issue with Dr. Smith was the already favorable testimony from Dr. Iknayen.

The testimony to the effect that the victim could not physically pull the shotgun trigger and cause the fatal wound, along with Petitioner's own admissions, provided overwhelming evidence that the victim was shot by someone else, specifically Petitioner. For those reasons, it simply cannot be said that the admission of the blood test results had a substantial and injurious effect on the jury's verdict. Any error, therefore, was harmless. Accordingly, Petitioner is not entitled to habeas relief on his Confrontation Clause claim.

Plaintiff contends that his trial counsel, was ineffective for failing to object to the introduction of the blood test results through Drs. Iknayen and Smith. Petitioner argues further that appellate counsel was ineffective for failing to raise the Confrontation Clause issue on appeal and for failing to raise trial counsel's failure to object.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

As noted above, any Confrontation Clause violation was harmless.  The harmlessness determination precludes any claim that Petitioner's trial counsel was ineffective for failing to object or that his appellate counsel was ineffective for failing to raise either the Confrontation Clause violation or the ineffective assistance claim based on trial counsel's failure to object.  The determination that any error was harmless under *Brecht* necessarily means that it is not prejudicial under *Strickland*.  *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (explaining that the *United States v. Agurs*, 427 U.S. 97 (1976), materiality standard, later adopted as the prejudice standard for ineffective assistance of counsel claims, requires the habeas petitioner to make a

18

greater showing of harm than is necessary to overcome the harmless error test of *Brecht*); *see also*

*Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016) ("[O]ur previous analysis of *Strickland*

prejudice applies to the assessment of whether the Confrontation Clause violation was harmless

error under *Brecht*."); *Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004) ("Because we find the

error to be harmless [under *Brecht*] Bell cannot meet the prejudice requirement of

*Strickland* . . . ."); *Kelly v. McKee*, No. 16-1572, 2017 WL 2831019 at *8 (6th Cir. Jan. 24, 2017)

("Because Kelly suffered harmless error [under *Brecht*] at best, he cannot establish that he suffered

prejudice [under *Strickland*]."). Therefore, any claim that counsel were ineffective is also without

merit.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of

appealability should be granted. A certificate should issue if Petitioner has demonstrated a

"substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth

Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of

appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must

"engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.

*Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in

*Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, I have

examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to

warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would

find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A

petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537

U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review,

but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong. Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.


Dated:   January 18, 2019                    */s/ Timothy P. Greeley*
                                             Timothy P. Greeley
                                             United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).